1  Robert T. Mills (Arizona Bar #018853)
2  Sean A. Woods (Arizona Bar #028930)
   **MILLS + WOODS LAW, PLLC**
3  5055 North 12th Street, Suite 101
   Phoenix, Arizona 85014
   Telephone 480.999.4556
4  docket@millsandwoods.com
5  swoods@millsandwoods.com
   *Attorneys for Plaintiffs*

6

7              **UNITED STATES DISTRICT COURT**

8                    **DISTRICT OF ARIZONA**

9  Edmon    Yohannes,    as    Personal        No.: CV-24-02087-PHX-ROS (CDB)
   Representative and on behalf of The Estate
10 of   Remon   Yohannes;   and,   Tesfai
   Haggmana,                                    **FIRST AMENDED COMPLAINT**
11
12              Plaintiffs,                      (Assigned to the Honorable Roslyn O.
                                                 Silver and referred to the Honorable
        vs.                                      Magistrate Camille D. Bibles for all
13                                               pretrial proceedings)
   State of Arizona, a governmental entity;
14 Maricopa County, a governmental entity;
   City of Phoenix, a governmental entity;
15 David   Crutchfield   and   Jane   Doe
   Crutchfield, a married couple; Lisa Struble
16 and John Doe Struble, a married couple;
   Michael Sullivan, Chief of the Phoenix
17 Police   Department;   Paul   Penzone,
   Maricopa County Sheriff; Pamela Conn
18 and John Doe Conn, a married couple;
19 Victor Gan and Jane Doe Gan, a married
   couple; Michael Chailland and Jane Doe
20 Chailland, a married couple; Lashon
   Arrington and John Doe Arrington, a
21 married couple; Miranda Sanders and John
22 Doe Sanders, a married couple; Brent
   Williams and Jane Doe Williams, a
23 married couple; Jannis Mossman and John
   Doe Mossman, a married couple; Bryant
24 Ball and Jane Doe Ball, a married couple;
25 Robin Avalos and John Doe Avalos, a
   married couple; Audaine Rintala and John
26 Doe Rintala, a married couple; Andrew
27 Fairfield and Jane Doe Fairfield, a married
28

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

couple; Michelle Martin and John Doe Martin, a married couple; Mary Daugomah and John Doe Daugomah; Mark Guerra and Jane Doe Guerra, a married couple; Yesenia Sambrano and John Doe Sambrano, a married couple; Julie Stevens and John Doe Stevens, a married couple; Sira Hodge and John Doe Hodge, a married couple; Christi Trevett and John Doe Trevett, a married couple; Cynthia Wright and John Doe Wright, a married couple; Allison Slaton and John Doe Slaton, a married couple; Michael Villegas and Jane Doe Villegas, a married couple; Building Blocks Counseling, LLC d/b/a Axiom Care, an Arizona limited liability company; John and Jane Does I-X,

Defendants.

Plaintiffs, by and through their attorneys, Mills + Woods Law, PLLC, for their Complaint against the STATE OF ARIZONA, a governmental entity; MARICOPA COUNTY, a governmental entity; CITY OF PHOENIX, a governmental entity; DAVID CRUTCHFIELD and JANE DOE CRUTCHFIELD, a married couple; LISA STRUBLE and JOHN DOE STRUBLE, a married couple; MICHAEL SULLIVAN, Chief of the Phoenix Police Department; PAUL PENZONE, Maricopa County Sheriff; PAMELA CONN and JOHN DOE CONN, a married couple; VICTOR GAN and JANE DOE GAN, a married couple; MICHAEL CHAILLAND and JANE DOE CHAILLAND, a married couple; LASHON ARRINGTON and JOHN DOE ARRINGTON, a married couple; MIRANDA SANDERS and JOHN DOE SANDERS, a married couple; BRENT WILLIAMS and JANE DOE WILLIAMS, a married couple; JANNIS MOSSMAN and JOHN DOE MOSSMAN, a married couple; BRYANT BALL and JANE DOE BALL, a married couple; ROBIN AVALOS and JOHN DOE AVALOS, a married couple; AUDAINE RINTALA and JOHN DOE RINTALA, a married couple; ANDREW FAIRFIELD and JANE DOE FAIRFIELD, a married couple; MICHELLE MARTIN and

JOHN DOE MARTIN, a married couple; MARY DAUGOMAH and JOHN DOE DAUGOMAH; MARK GUERRA and JANE DOE GUERRA, a married couple; YESENIA SAMBRANO and JOHN DOE SAMBRANO, a married couple; JULIE STEVENS and JOHN DOE STEVENS, a married couple; SIRA HODGE and JOHN DOE HODGE, a married couple; CHRISTI TREVETT and JOHN DOE TREVETT, a married couple; CYNTHIA WRIGHT and JOHN DOE WRIGHT, a married couple; ALLISON SLATION and JOHN DOE SLATON, a married couple; MICHAEL VILLEGAS and JANE DOE VILLEGAS, a married couple; BUILDING BLOCKS COUNSELING, LLC d/b/a AXIOM CARE, an Arizona limited liability company; and, JOHN and JANE DOES I-X (collectively "Defendants"), hereby allege as follows:

## INTRODUCTION

This case arises out of the abject failures of multiple governmental agencies and individuals to protect and provide proper care for Remon Yohannes ("Remon") The individual defendants' actions are a direct result of reckless apathy and the intentional deprivation of rights afforded to Remon by the Arizona and United States Constitution.

## JURISDICTION AND VENUE

1.    Pursuant to 42 U.S.C. §1983 *et seq.*, Plaintiffs bring this action for violations of the United States Constitution, including without limitation the Eighth and Fourteenth Amendments and Arizona common and statutory laws, including A.R.S. §12-611, *et seq*.

2.    The amount in controversy exceeds the minimal jurisdictional limits of this Court.

3.    To the extent applicable, and without conceding that said statute applies, Plaintiffs have served their Notice of Claim upon Defendants in compliance with A.R.S. §12-611, *et seq.* More than sixty (60) days have expired since Plaintiffs served their Notice of Claim and Defendants have not responded in any manner to said Notice of Claim.

4.    Pursuant to Article 6, Section 14 of the Arizona Constitution, this court has original subject matter jurisdiction in this Complaint because the claims relate to causes of action, the underlying acts and/or omissions for which, at all times relevant, have caused the events alleged herein to occur with primary effect in Maricopa County, Arizona.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

5.      Venue is proper in that the specific acts giving rise to the causes of action alleged herein occurred with primary effect in Maricopa County, Arizona.

**PARTIES**

6.      At all relevant times until his death on October 14, 2023 at the age of thirty (30), Remon Yohannes ("Remon") was an individual residing in Maricopa County, Arizona.

7.      At all relevant times, Plaintiff Tesfai Haggmana ("Tesfai") was an individual residing in Maricopa County, Arizona, and is one of the natural parents of Remon.

8.      At all relevant times, Plaintiff Edmon Yohannes ("Edmon") as personal representative of the Estate of Remon Yohannes (the "Estate") was an individual residing in Maricopa County, Arizona.

9.      On November 2, 2023, the Superior Court, Maricopa County, Arizona, appointed Edmon Yohannes as Personal Representative of the Estate.

10.     Defendant STATE OF ARIZONA (the "State") is a governmental entity that acts by and through its officials, employees, and agents, including without limitation the Arizona Department of Corrections ("ADOC").

11.     Defendant CITY OF PHOENIX ("COP") is a governmental entity that acts by and through its officials, employees, and agents, including without limitation the Phoenix Police Department.

12.     Defendant MARICOPA COUNTY ("Maricopa") is a governmental entity that acts by and through its officials, employees, and agents, including without limitation the Maricopa County Correctional Health Systems ("CHS").

13.     Defendant PAUL PENZONE ("Penzone") is sued in his official and individual capacity. He was tasked with oversight of the Maricopa County Sheriff's Office ("MCSO") and was responsible for all policies and procedures promulgated by the MCSO. Penzone is responsible for MCSO officials, employees and agents.

14.     Defendant MICHAEL SULLIVAN is the Chief of the Phoenix Police Department and is sued in his official and individual capacity. He is tasked with oversight of the Phoenix Police Department and is responsible for all policies and procedures

Mills + Woods Law, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

4

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

promulgated by the Phoenix Police Department. He is an agent of the City of Phoenix and the Phoenix Police Department, operating in his official and individual capacity in Maricopa County, Arizona.

15.     MICHAEL VILLEGAS was at all relevant times employed as a Phoenix Police Officer and was acting as an agent of COP and the Phoenix City Police Department. Villegas is sued in his official and individual capacity.

16.     Defendant LISA STRUBLE was at all relevant times in this complaint upon information and belief the Director of CHS, employed by, and serving as an agent of, Maricopa, and CHS. At all relevant times she was operating in her official and individual capacity in Maricopa County, Arizona.

17.     Defendant DAVID CRUTCHFIELD was at all relevant times in this complaint upon information and belief the Medical Director of CHS, employed by, and serving as an agent of, Maricopa, and CHS. At all relevant times he was operating in his official and individual capacity in Maricopa County, Arizona.

18.     PAMELA CONN ("Conn") was at all relevant times employed as a Phoenix Police Officer and was acting as an agent of COP and the Phoenix City Police Department. Villegas is sued in his official and individual capacity.

19.     VICTOR GAN ("Gan") was at all relevant times employed with CHS and Maricopa and was acting as an agent of CHS and Maricopa. Gan is sued in his official and individual capacity.

20.     MICHAEL CHAILLAND ("Chailland") was at all relevant times employed with CHS and Maricopa and was acting as an agent of CHS and Maricopa. Chailland is sued in his official and individual capacity.

21.     LASHON ARRINGTON ("Arrington") was at all relevant times employed with CHS and Maricopa and was acting as an agent of CHS and Maricopa. Arrington is sued in his official and individual capacity.

22.     MICHELLE MARTIN ("Martin") was at all relevant times employed with CHS and Maricopa and was acting as an agent of CHS and Maricopa. Martin is sued in her official and individual capacity.

23.     MARY DAUGOMAH ("Daugomah") was at all relevant times employed with CHS and Maricopa and was acting as an agent of CHS and Maricopa. Daugomah is sued in her official and individual capacity.

24.     SIRA HODGE ("Hodge") was at all relevant times employed with CHS and Maricopa and was acting as an agent of CHS and Maricopa. Hodge is sued in his/her official and individual capacity.

25.     CHRISTI TREVETT ("Trevett") was at all relevant times employed with CHS and Maricopa and was acting as an agent of CHS and Maricopa. Trevett is sued in her official and individual capacity.

26.     CYNTHIA WRIGHT ("Wright") was at all relevant times employed with CHS and Maricopa and was acting as an agent of CHS and Maricopa. Wright is sued in her official and individual capacity.

27.     JULIE STEVENS ("Stevens") was at all relevant times employed with CHS and Maricopa and was acting as an agent of CHS and Maricopa. Stevens is sued in her official and individual capacity.

28.     ROBIN AVALOS ("Avalos") was at all relevant times employed with CHS and Maricopa and was acting as an agent of CHS and Maricopa. Avalos is sued in her official and individual capacity.

29.     AUDAINE RINTALA ("Rintala") was at all relevant times employed with CHS and Maricopa and was acting as an agent of CHS and Maricopa. Rintala is sued in her official and individual capacity.

30.     ANDREW FAIRFIELD ("Fairfield") was at all relevant times employed with CHS and Maricopa and was acting as an agent of CHS and Maricopa. Fairfield is sued in his official and individual capacity.

31.     Conn, Gan, Chailland, Arrington, Martin, Daugomah, Trevett, Wright, Stevens, Avalos, Rintala, and Fairfield collectively referred to as "CHS Defendants".

32.     MIRANDA SANDERS ("Sanders") was at all relevant times employed with MCSO and was acting as an agent of MCSO. Sanders is sued in her official and individual capacity.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

33.    BRENT WILLIAMS ("Williams") was at all relevant times employed with MCSO and was acting as an agent of MCSO. Williams is sued in his official and individual capacity.

34.    JANNIS MOSSMAN ("Mossman") was at all relevant times employed with MCSO and was acting as an agent of MCSO. Mossman is sued in her official and individual capacity.

35.    BRYANT BALL ("Ball") was at all relevant times employed with MCSO and was acting as an agent of MCSO. Ball is sued in his official and individual capacity.

36.    Sanders, Williams, Mossman, and Ball collectively referred to as "MSCO Defendants".

37.    MARK GUERRA ("Guerra") was at all relevant times employed with the State through the Arizona Department of Corrections ("ADOC") and was acting as an agent of ADOC and the State. Guerra is sued in his official and individual capacity.

38.    YESENIA SAMBRANO ("Sambrano") was at all relevant times employed with the State through the ADOC and was acting as an agent of ADOC and the State. Sambrano is sued in her official and individual capacity.

39.    ALLISON SLATON ("Slaton") was at all relevant times employed with the State through the ADOC and was acting as an agent of ADOC and the State. Slaton is sued in her official and individual capacity.

40.    Sanders, Williams, Mossman, Ball, Guerra, Sambrano, and Slaton are collectively referred to as the "State Defendants".

41.    BUILDING BLOCKS COUNSELING, LLC d/b/a AXIOM CARE ("Axiom"), an Arizona limited liability company;

42.    The City of Phoenix is vicariously liable under the principle of *respondeat superior* for the actions and inactions of the employees of the Phoenix Police Department and any private contractors including those employees or contractors named as defendants in this action, as to any claims that are asserted by Plaintiff as a result of violations of the Arizona Constitution and Arizona common law because, at all relevant times, Defendants were acting within the course and scope of their employment or contract with Phoenix - or

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

entities privately contracted with Phoenix.

43.    Maricopa is vicariously liable under the principle of *respondeat superior* for the actions and inactions of the employees of Maricopa and any private contractors including those employees or contractors named as defendants in this action, as to any claims that are asserted by Plaintiff as a result of violations of the Arizona Constitution and Arizona common law because, at all relevant times, Defendants were acting within the course and scope of their employment or contract with Maricopa – or entities privately contracted with Maricopa.

44.    The State of Arizona is vicariously liable under the principle of *respondeat superior* for the actions and inactions of the employees of the State of Arizona and any private contractors including those employees or contractors named as defendants in this action, as to any claims that are asserted by Plaintiff as a result of violations of the Arizona Constitution and Arizona common law because, at all relevant times, Defendants were acting within the course and scope of their employment or contract with the State of Arizona or entities privately contracted with the State of Arizona.

45.    The individually named defendants were at all relevant times acting for the benefit of their respective marital communities, if any, and therefore their respective marital communities are liable for their actions as alleged herein. Accordingly, JOHN AND JANE DOES VILLEGAS, CONN, GAN, CHAILLAND, ARRINGTON, MARTIN, DAUGOMAH, HODGE, TREVETT, WRIGHT, STEVENS, AVALOS, RINTALA, FAIRFIELD, SANDERS, WILLIAMS, MOSSMAN, BALL, GUERRA, SAMBRANO, SLATON, MOORE, ZAVALA, and ZAMBRANO are named as Defendants herein.

46.    JOHN and JANE DOE Defendants I-X represent individuals who may be liable for the acts or omissions as set forth in Plaintiffs' Complaint. Plaintiff will substitute the true names of these defendants upon discovery.

47.    For purposes of Plaintiffs' claims arising under Federal law, including without limitation the United States Constitution and 42 U.S.C. §1983 *et seq*., and as may be relevant to Plaintiff's state law claims, at all relevant times described herein, Defendants were acting under color of state law.

48.     Each of the Defendants failed to do what is minimally required of them by the United States Constitution, and the laws of the State of Arizona, relative to the care, custody and control of Remon Yohannes.

49.     By failing in these obligations, Defendants were deliberately indifferent to Remon's rights guaranteed him by the United States Constitution and the State of Arizona.

50.     As a result of Defendants' deliberate indifference and as a result of intentional acts and omissions to act that fell below the proscribed standard of care – through failures to properly supervise; properly carry out their job duties; and to properly administer medical attention – Remon died at the age of thirty (30).

## BACKGROUND

51.     Remon was a type one (1) diabetic.

52.     As a result, he was insulin dependent.

53.     As a type one (1) diabetic, Remon from time to time would experience symptoms of his disease, including high blood sugar.

54.     Remon was familiar with and adept at handling his symptoms and knowing when the onset of the same would occur.

55.     Remon valued his life and took care of himself to ensure he would not have potentially life-threatening issues as a result of his diabetes.

56.     Remon had been diagnosed as a type one (1) diabetic in October of 2006 and knew how to manage it – when he was freely able to do so.

57.     In December 2022, Remon had served time in the ADOC and was put on parole and released on December 13, 2022.

58.     Remon worked hard to meet all of his release conditions.

59.     By February 2023, Remon's future was bright. He had achieved an addiction-free and sober lifestyle and was active in his family's lives.

60.     Unfortunately, he was in another severe car accident on February 16, 2023 and was prescribed morphine when he received medical care. This caused him to relapse.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

61.    During that time, Remon was back home with family working on his sobriety and receiving medical and dental care.

62.    He was working with job referral programs to obtain employment. Previously, Remon had managed a car wash, a landscaping company, and a construction company.

63.    Shortly after the car accident, Remon violated his parole conditions and returned to MCSO's Intake, Transfer, and Release Jail ("ITR") on February 23, 2023.

64.    At his intake, it was determined that Remon was suffering from Diabetic Ketoacidosis ("DKA") and was transferred to the Emergency Department of Valleywise Hospital.

65.    MCSO, CHS, and their employees were well aware of Remon's type one (1) diabetes. Additionally, this was not the only time they needed to provide emergency care to Remon. Remon was sent to emergency care on at least three other occasions by MCSO and CHS due to Remon having DKA.

66.    Once Remon was cleared medically, he returned to ITR, and on April 11, 2023, was sent to ADOC's Alhambra Unit at the Arizona State Prison Complex.

67.    In July 2023, Remon agreed to attend drug rehabilitation and his parole officer, Mark Guerra, set Remon up to attend Axiom Care Rehabilitation.

68.    Remon checked into Axiom's Del Sol property at 1422 N 44th St in Phoenix, Arizona.

69.    On July 14, 2023, Remon was taken to Axiom detox in Apache Junction at 150N Ocotillo Dr. because he wanted help due to his relapse. At check-in he tested positive for fentanyl and THC.

70.    Remon was able to leave this facility and ended up on the streets. He suffered multiple injuries while on the street – including orbital fractures and second degree burns on his buttocks.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

71.     On July 21, 2023, Remon returned to the Del Sol property. After a week, on July 28, 2023, Remon was seen for an "Initial CM Meeting." During that meeting, Remon expressed his family and relatives are a strong sober support network for him.

72.     On or about August 12, 2023, a female resident had a medical emergency in the facility.

73.     Instead of the staff attending to her, they had Remon perform CPR techniques on her.

74.     While Remon was helping, she died. This was extremely traumatic to Remon and caused him to relapse.

75.     On August 13, 2023, Remon was able to leave the Axiom property in the evening and then he returned early in the morning and tested positive for THC and Buprenorphine.

76.     The next day, Remon was able to leave the property again and return. He did not test positive for any substances.

77.     Again, on the following day – August 15, 2023 – Remon was able to leave the property and then returned, again.

78.     He tested negative again.

79.     On August 16, 2023, Remon was taken to Valleywise for medical clearance because he tested positive for fentanyl.

80.     Later that evening, he returned to the Axiom Del Sol property.

81.     On August 22, 2023, he again tested positive for fentanyl, THC, and methamphetamine.

82.     On August 25, 2023, Remon was administratively discharged from Axiom and a warrant for his arrest was issued.

83.     Despite this, on August 26th, 2023, Remon was sent from the Del Sol facility to the Apache Junction Detox facility.

84.     While at the detox facility, Remon was sent to Mountain Vista Hospital for medical clearance to allow him to complete his detox.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

85.     While at the hospital the staff noted that his screening was "unremarkable" and that "his hyperglycemia improved to 179 without intervention in the emergency department. He was clinically stable to return to the facility" as seen in the image below:

Mountain Vista Medical Center
Patient name: Yohannes,Remon
Account #: VS0006628614

Report Number: HIM0828-00648
Medical Record#: VM30079554

**- MDM**
**Medical decision making narrative:**
30-year-old male presenting to the emergency department for stabilization of hyperglycemia and medical clearance to return to inpatient detox facility. His physical examination was grossly unremarkable. Basic labs were ordered, the patient stated that he was a difficult stick and requested monitoring by fingerstick glucose instead. His hyperglycemia improved to 179 without intervention in the emergency department. He was clinically stable to return to the facility.

Differential diagnosis: Hyperglycemia, opioid withdrawal
Chronic conditions affecting care: Insulin-dependent diabetes (Schlesinger,David)

**Discharge Plan**

**- Discharge**
**Clinical Impression:**
Hyperglycemia due to type 1 diabetes mellitus, Medical clearance for psychiatric admission

86.     Despite Remon being cleared to return and continue his detox, the detox facility through its employee, Kellee Zambrano, kicked Remon out of the location in Apache Junction, without even offering a ride, phone call, or contacting Remon's family to help him get somewhere safe.

87.     Remon instead went down the street to find an open business, and on August 29, 2023, at approximately 01:00 a.m., Remon's brother paid for a cab to return him to the Del Sol facility.

88.     Remon returned to Del Sol at approximately 01:40 a.m. and was then sent to Valleywise Hospital for medical clearance.

89.     Remon received medical clearance after approximately 1.5 hours at the ER.

90.     He went back to Axiom to pack up his belongings and then checked into the ADOC's Re-entry and Rehabilitation Facility ("MRC") after meeting with his Parole Officer on the morning of 8/30/2023.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

91.     During his time with Axiom, Axiom and its employees made it difficult for Remon to get his medication – requiring family members to call and advocate for Remon's treatment.

92.     While at the ADOC MRC, Remon did not have access to his medication and was forced to advocate for himself several times before an appointment was made.

93.     He was taken to and attended his appointment to obtain a refill prescription for his medications – including those to help manage his diabetes.

94.     Despite the ADOC MRC being a secure facility, upon information and belief, COII Sambrano Badge #10215 left him at the hospital and did not return to pick him up.

95.     The ADOC and MCSO did not secure Remon.

96.     Nobody from Axiom, MCSO, or ADOC picked him up from this appointment.

97.     Remon hit the streets and was effectively homeless because of both the ADOC's and MCSO's indifference.

98.     On September 7, 2023, ADOC Sergeant Allison Slaton wrote:

> At approximately 1629 hours, I was contacted by nurse Casandra at Terros Health who informed me that Yohannes was back onsite. She said that he had left to go get food due to him being a diabetic and would like transport to come back and pick him up. I called PO Guerra who told me that he would like Yohannes to report back to his office in the morning. I called nurse Casandra back at 602-302-7860 and she said that she would pass on the message to Yohannes.

99.     Slaton and Mark Guerra, Remon's parole officer, let Remon do whatever he wanted with no oversight.

100.    Remon was under ADOC control because he was placed at the MRC.

101.    Slaton, Sambrano, and Guerra were required to ensure he returned.

102.    He should never have been left alone.

103.    Remon needed help and was doing everything in his power to receive it.

104.    Guerra's decisions led to Remon's deteriorating health and eventual death.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

105.   Sergeant Slaton is complicit in that she allowed Guerra to dictate her actions knowing full well she had a duty and responsibility to control Remon's movements.

106.   In Axiom's discharge paperwork, an entry made on September 14, 2023, stated "There are no medications to note."

107.   This was entered by Deanna Moore, Lead Counselor 1 and reviewed by Sarah Zavala, NP.

108.   They are liable for Remon's deterioration and eventual death as they knew he was a type one (1) diabetic but failed to provide that information in his discharge paperwork – paperwork that could reasonably be relied upon by Remon's next caregivers.

109.   They also failed repeatedly in ensuring that Remon was receiving his medications, requiring constant reminders and demands from Remon's family members while he was at Axiom.

110.   On October 12, 2023, Remon was stopped by police because they "witnessed" Remon with a tube in his mouth with smoke billowing from it.

111.   There was a separate drug deal incident that occurred close by.

112.   Remon was seen with a white woman.

113.   Upon information and belief – and according to police records, Remon was the only one arrested.

114.   The white woman involved was released at the scene, but Remon was ostensibly taken into custody because he had an outstanding parole violation warrant. Remon was also booked on additional charges.

115.   On October 12, 2023, Remon was taken to the Central City Precinct and eventually was taken to ITR to be processed.

116.   During his time before being processed, Remon can be seen in distress throughout – at points even passed out on the floor near a bathroom.

117.   After processing, he was transferred to the MCSO's Fourth Avenue Jail ("Fourth Avenue") in downtown Phoenix.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

118.    He was in severe distress due to having extreme diabetic symptoms, including lethargy, disorientation, intense pain, thirst, dehydration, disorientation, and nausea, among other things.

119.    On video, at his health assessment, it appears that Remon's vitals – including his blood sugar – were checked.

120.    Nobody provided him with medical treatment.

121.    At the receiving screening, CHS marked "no" to the question "Has the patient shown any sign of acute substance use effects or withdrawal while in custody, such as hallucinations, tremors, sweats, N/V/D, or excessive sedation? (Describe officer observations, including treatment if any.)"

122.    Officer Michael Villegas #11668 was listed as the arresting officer.

123.    Remon had exhibited classic signs of withdrawal during his arrest and transport to City holding facilities and to MCSO intake.

124.    Remon can clearly be seen vomiting on camera during his Health Assessment.

125.    The intake was marked that Remon does suffer from a medical condition in that same screening.

126.    Villegas is culpable in Remon's death.

127.    Had he reported what was obvious, Remon's course of health care could have changed and could have kept him alive.

128.    Instead, he failed to alert medical professionals of proper observations of Remon's health conditions.

129.    He should have called EMTs or the Fire Department to check Remon because of Remon's obvious negative health conditions.

## **FACTUAL ALLEGATIONS**

130.    ADOC, MCSO, and CHS all maintained records that dictated Remon's medical history – including the fact that he was insulin-dependent.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

131.    Furthermore, these records showed that not only was he a type one (1) diabetic, but that they had regularly treated him for this condition.

132.    The records also show that Remon had suffered from Diabetic Ketoacidosis ("DKA") on multiple occasions.

133.    DKA is a life-threatening complication of diabetes that occurs when the body produces too many ketones too fast and becomes acidic.

134.    According to CHS' records during 2018 and beyond, Remon's blood glucose was measured daily beginning on October 13, 2018 with results ranging from 163-315.

135.    Medical professionals at MCSO and CHS had previously tried to hide the fact that Remon was a type one (1) diabetic despite having full records showing so.

136.    On June 24, 2019, Dr. Victor Gan even wrote that – *while Remon was afflicted with DKA* – that "This is NOT DKA, px does not have type 1 DM".

137.    In fact, Remon had been afflicted with DKA and sent to the ER a total of ***five times*** while under ADOC's, MCSO's, and CHS' care.

138.    Remon's records are full of medication entries that Remon took.

139.    On June 24, 2019, the same Victor Gan who inexplicably stated that Remon was not suffering from DKA, the very same day, entered drug orders for Remon for Lantus Subcutaneous … 100 UNIT/ML".

140.    He ordered a quantity of 20 to be given once in the evening daily.

141.    According to MedLinePlus.gov, Lantus is Insulin Glargine-yfgn.

142.    Victor Gan also ordered Regular Insulin Sliding Scale treatments for Remon – something that is reserved typically for type one (1) diabetics and only for severely/critically ill type two (2) patients.

143.    In fact, Remon had always been treated as a Regular Insulin Sliding Scale patient.

144.    Remon was given his medications regularly – including his type one (1) diabetes medications. This continued until he was released to the ADOC. CHS knew he was a type one (1) diabetic as early as June 2019.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

145.     During 2021 and 2022 Remon's records show that ADOC knew that Remon was a type one (1) diabetic.

146.     He was prescribed multiple drugs – many of which were to control his type one (1) diabetes. These included Regular Insulin and Lantus.

147.     During the entirety of this timeframe, Remon was given regular blood glucose tests.

148.     In April to May 2023, CHS medical records show "Patient Flags" as "Type 1 diabetes mellitus without complications, MH-1, MED-2, Hypertension, Diabetes-Type 1".

149.     During this timeframe, ADOC maintained medical records for Remon that explicitly record his diabetes type one (1) and show that two types of diabetic medication must be administered to Remon – Insulin Glargineyfgn Subcutaneous once a day and NovoLIN R injection twice a day.

150.     At that same time, Treatments ordered for Remon included BLOOD GLUCOSE CHECK twice a day for diabetics.

151.     ADOC records show that they had flagged Remon as having Type 1 diabetes mellitus as early as June 9, 2021 and re-flagged the same on April 11, 2023.

152.     In the "Problems" section of ADOC's records, the same entries are seen.

153.     Blood sugar levels are measured in milligrams per deciliter (mg/dL).

154.     Normal blood sugar levels are from 70-99 mg/dL while fasting, and 125 or lower mg/dL when measured randomly.

155.     A blood sugar level of 250 or higher mg/dL is considered dangerous and requires emergency medical treatment in order to prevent the body from going into DKA.

156.     For a Type 1 diabetic, blood sugar levels are brought down by the administration of insulin into the body.

157.     From April 11, 2023 until May 26, 2023, the records show that Remon's Glucose / Blood Sugar levels were taken daily and ranged from 85 to 279.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

158.    Every time his blood sugar levels rose up to 200 or above, he was administered 2 doses of insulin. In times where his blood sugar was exceedingly high, he was administered 4 doses of insulin.

159.    At his release on May 27, 2023, Remon was given a prescription for both Insulin Glargine, and Novolin R injections.

160.    On October 13, 2023, CHS performed a health assessment.

161.    This was performed by Mary Daugomah with the code "CHT; CH674" and by Avalos.

162.    Avalos noted in Remon's chart that he had "Opiate withdrawal" and Diabetes Type 1.

163.    Avalos further noted that Remon's Past Medical History ("PMH") was "type 1 diabetes".

164.    Avalos did not order medications for Remon.

165.    Daugomah did not order medications for Remon.

166.    Neither of them took any steps to ensure Remon received treatment that he needed.

167.    They both understood that Remon was suffering from painful and debilitating conditions and allowed his health to continue to deteriorate.

168.    Furthermore, at his intake, a note states that Remon told staff he was type one (1) diabetic.

169.    The staff member wrote in these same notes that "Pt states DM1 on HA – please verify, if yes, need A1C and insulin dosages from pt".

170.    This should have and could have easily been confirmed by reviewing Remon's record for continuity of care and medication administration.

171.    Interestingly, on October 14, 2023 at 6:34:04 A.M., Sira Hodge wrote that Remon's record was reviewed for continuity of care and medication administration.

172.    If this were true, it would have been glaringly obvious that action must be taken by CHS employees to ensure that Remon was given the proper medical treatment.

173.   Sira failed Remon and was one of many along the way that failed to properly check Remon's medical history and correct his file to ensure he received medical care.

174.   Sira should have ordered or requested a blood sugar check and insulin treatment.

175.   However, Remon's "Flags" – entered on October 13, 2023 – were bereft of any entry related to his type one (1) diabetes.

176.   According to his records, Remon was never administered any diabetic medication at all on October 13, 2023 or October 14, 2023.

177.   The only records of drugs purportedly administered to Remon show that he received one dose of Acetaminophen and one dose of Ondansetron at 3:42:31 P.M. on October 13, 2023.

178.   At 3:42:31 P.M., Michael Chailland notes that he administered acetaminophen and ondansetron to Remon but does not note that any diabetic medication was administered.

179.   Chailland should have reviewed Remon's records.

180.   Had he done so, he would have seen that Remon was a type one diabetic in need of medical treatment for that condition.

181.   He failed to do so even though he was providing medication to Remon.

182.   At that moment, insulin should have been ordered, but Chailland failed to do so.

183.   At approximately 7:22 P.M. on October 13, 2023, Remon was placed in a transportation holding cell.

184.   He was left in the cell with other detainees until approximately 8:06 P.M.

185.   He then was transferred to another holding cell. On the way, Remon can be seen leaning against walls for support in the elevator and in the hallways. It is clear from the video that Remon was in distress.

186.   From 8:14 P.M. until Midnight, in cell 2A Cell 101-1, Remon can be seen on a bunk writhing in pain.

19

187.    From midnight until approximately 6:20 A.M. on October 14, 2023, Remon can be seen visiting the toilet multiple times.

188.    It is believed he was vomiting profusely.

189.    Inmates in Remon's cell reported that he was vomiting "black stuff."

190.    Shortly thereafter, Ball visited Remon's cell and specifically checked on Remon – upon information and belief because he was moaning and writhing in his bunk.

191.    Ball helped Remon to the toilet whereupon he again was vomiting.

192.    Remon returned to his bunk and the guard left the cell.

193.    Despite nobody entering Remon's cell for hours until shortly after 6:20 A.M., an entry in his record states that at 01:24 A.M. on October 14, 2023 a COWS check could not be performed because Remon was "not active" and "unavailable".

194.    COWS stands for "Clinical Opiate Withdrawal Scale".

195.    Had a COWS check been performed at 01:24 A.M., Remon would have clearly been seen by medical that he was in severe distress.

196.    This was another wasted opportunity to provide Remon with medical care he desperately needed.

197.    This was also another fraudulent entry in Remon's records. Nobody checked on him at 01:24 A.M.

**9AM INCIDENT**

198.    LaShon Arrington wrote that at 7:00:00 A.M. on October 14, 2023, Remon refused his medications.

199.    This is false.

200.    The video record from October 14, 2023, shows Remon was in his cell on his bunk from 6:54 A.M. until 8:19 A.M.

201.    Those timestamps are important, because at each one of those two timestamps, a ***GUARD*** – Ball – entered the cell and left. As seen on the video, the guard had no conversation with Remon.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

202.   Despite multiple records requests to the MCSO, many of the guards' identities are still unknown. Plaintiffs therefore will amend this complaint upon discovery of these individuals.

203.   Nobody else came to the cell or spoke to Remon between those times.

204.   It is therefore impossible for the entries in the CHS medical records to be true.

205.   Additionally, the record is rife with instances that state Remon refused treatments at dates and times that show Remon on video – always in his bunk and with no CHS employees at Remon's cell

206.   Nobody came to treat or assess Remon during those dates and times.

207.   For instance, the record states that COWS were completed by Julie Stevens on 10/14/23 12:00 P.M., but there was nobody who checked on him in any of the video footage at that time.

208.   Julie also states that Remon *refused* treatment.

209.   She did not visit him to obtain acceptance or refusal.

210.   In fact, Remon actually begged for treatment because of his type (1) one diabetes condition.

211.   Remon's location never changed while he was in the facility – until he was taken offsite by Phoenix Fire.

212.   MCSO and CHS and their staff members paid no attention to any sort of detail regarding Remon.

213.   At 9:24:00 A.M., Remon is seen on video getting up from his bunk, but then he collapses to the floor against a wall and other inmates can be seen checking on him.

214.   At 9:24:47 A.M. Remon collapses to the floor in fetal position.

215.   At 9:25:16 A.M., Ball comes in and starts trying to rouse Remon – with no success, Ball leaves the cell.

216.   At 9:27:51 A.M., an unknown woman who was CHS staff can be seen leaning into the cell and Ball comes back.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

1    217.    At 9:28:01 A.M., Ball handcuffs Remon.

2    218.    At 9:28:13 A.M., Ball physically drags Remon's body out of the cell.

219.    At 9:28:18 A.M., despite Remon's condition being obviously critical, the Outside Cell "2A1 Pod PTZ -8 CAMERA" shows several CHS medical personnel on scene with Remon, but no urgency is shown by anybody – in fact, multiple different people can be seen milling about laughing and smiling – while Remon's body was on the ground.

220.    A late entry in Remon's medical record indicates that during medical's response to Remon at 9:28 A.M., CHS medical personnel checked Remon's blood sugar level and found it to be 340, which is extremely and dangerously high.

221.    The video doesn't confirm that this was actually done.

222.    Regardless, no one administered insulin to bring Remon's blood sugar down. Instead, CHS chose a course of action that ensured Remon's untimely death.

223.    Incredibly, at 9:32:45 A.M., despite actual knowledge that Remon's blood sugar was at a dangerously high level, a Nurse – believed to be Julie Stevens – is seen swishing green liquid in gallon container and then ultimately feeds it to Remon – four (4) cups worth of Gatorade.

224.    Gatorade's first three ingredients are water, sugar, and dextrose.

225.    According to Healthline.com, "Dextrose should be carefully given to people who have diabetes, because they might not be able to process dextrose as quickly as would someone without the condition. Dextrose can increase blood sugar too much, causing what's known as hyperglycemia."

226.    Other CHS health professionals were present and watched as Stevens fed the Gatorade to Remon.

227.    None of the other medical professionals – including Pamela Conn – stepped in to prevent the Gatorade from being given to Remon.

228.    None of the other medical professionals – including Pamela Conn – stepped in to determine how much insulin to give Remon to offset not only his current extremely elevated blood sugar, but also the added sugar they just fed him.

22

229.    According to records, CHS employees, CHT Elizabeth and Mental Health staff Roseanna 2910H, were also present at the 9AM Incident.

230.    Neither one of them stepped in to provide the proper treatment to Remon and neither one intervened when the Gatorade was fed to Remon.

231.    The medical staff should have foreseen the danger of providing sugar and dextrose to a type 1 diabetic.

232.    Incredibly, it is MCSO's and CHS' blanket policy to feed Gatorade to inmates without checking medical history.

233.    At 9:33:00 A.M. Remon is in a wheelchair.

234.    At 9:35:00 A.M., it appears the medical staff takes vitals of Remon.

235.    At 9:38:14 A.M., Remon stands and then sits and shortly thereafter Remon returns to his cell and climbs back into his bunk.

236.    At this time, if any of the Defendants had reviewed Remon's medical file and assessed his symptoms, it would have been abundantly clear that Remon had already been in the throes of Diabetic Ketoacidosis ("DKA") Remon – signs that he had been displaying since his arrival at Fourth Avenue.

237.    Remon was displaying a majority of DKA symptoms as soon as the Phoenix Police had taken him to the ITR on October 12, 2023, but had ramped up to nearly uncontrollable as of 9:27 A.M. on October 14, 2023.

238.    Remon was confused.

239.    Remon was dehydrated.

240.    Remon was in severe pain.

241.    Remon was extremely thirsty.

242.    Remon was vomiting repeatedly.

243.    Remon was having trouble breathing.

244.    Remon had markedly decreased alertness.

245.    Remon had begun falling into a DKA coma.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

246.    If the late entry is correct, Remon's blood sugar levels were over 300 – specifically 340 as of 9:30 A.M. on October 14, 2023.

247.    Yet, the Defendants chose to feed Remon Gatorade – a drink full of sugar.

248.    Instead of doing their job, the Defendants failed to check Remon's diagnoses, failed to recognize the obvious signs of DKA, and ***then did the exact opposite of what they were supposed to do*** by having Remon ingest 54 grams of sugar while he was in DKA.

249.    Remon's life could have easily been saved.

250.    He should have been given insulin and monitored over the course of the next few hours to ensure his blood sugar levels were reduced to acceptable levels.

251.    Instead, they pumped him full of sugar and threw him back in his cell where he quickly became so toxic that his organs began shutting down and his blood turned against him.

252.    Furthermore, Julie Stevens reported that one of the CHS Defendants (she could not remember who) had said that Remon needed to be taken to medical, but she did not ensure that occurred.

253.    None of the CHS Defendants took him to medical.

254.    Instead, they put him back in his bunk.

255.    According to the records, Remon was pleading with them that he had type one diabetes and needed to receive treatment.

256.    His concerns were not addressed.

257.    No treatment for diabetes was given.

## 2PM INCIDENT

258.    At 3:49:24 P.M., Audaine Rintala entered blood sugar results for Remon showing that his Results were 340.

259.    This entry was made nearly two (2) hours after Remon had already been taken to the Emergency Room, where his blood sugar level was tested and found to be 512.

Mills + Woods Law, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

260.    She did not take these measurements at that time.

261.    They had been taken earlier in the day.

262.    She failed to report these results timely, which caused Remon to enter DKA and ultimately die.

263.    After Remon had been returned to his cell following the 9AM Incident, Remon can be seen lying in his bed writhing for the next couple hours.

264.    At 11:06:49 A.M., Remon stands up and then stumbles.

265.    At 11:07:00 A.M., Remon walks in circles and then falls backward towards his bunk twirling and eventually hitting his head.

266.    He then rubs his head vigorously while on the floor.

267.    At 11:07:49 A.M., Remon sits up and crawls back into bed.

268.    Nothing happens for the next couple hours except Remon writhing in his bunk – despite the entry in his medical records that state he was checked on.

269.    At 1:54:30 P.M., Remon gets up to go to bathroom.

270.    At 1:55:18 P.M., an unknown black inmate checks on Remon while other inmates go to the cell door to yell for guards.

271.    At 1:55:50 P.M., an unknown black inmate goes to the cell door yelling for guards while Remon is still on floor.

272.    At 1:56:15 P.M., cell inmates start waving frantically at the camera while yelling for guards.

273.    At 1:56:49 P.M., cell inmates try to help Remon – even inmates outside his cell are frantically trying to get staff's attention.

274.    Inmates were banging on the doors because nobody was responding.

275.    At 1:57:16 P.M., an unknown black inmate tries to call for guards.

276.    At 1:58:40 P.M. Guards can finally be seen walking to Remon's cell.

277.    Remon is then handcuffed.

278.    At 1:59:08 P.M., Medical arrives.

279.    At 1:59:38 P.M., Guards see Remon.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

25

280.    At 1:59:49 P.M., Nurse has green liquid again.

281.    At 2:00:19 P.M., Remon's vitals are checked.

282.    At 2:00:53 P.M., CPR is started, guards start becoming frantic, and Medical staff requests he be uncuffed.

283.    At 2:01:30 P.M., in what can only be described as horrific, video shows CPR being performed on Remon, but with every chest compression, a brownish/blackish liquid pours profusely out of Remon's mouth.

284.    At 2:01:52 P.M., Phoenix Fire Department is called.

285.    At 2:01:57 P.M., it is believed that a defibrillator is used.

286.    At 2:02:06 P.M., the staff starts CPR again.

287.    At 2:02:27 P.M., a gurney is wheeled in.

288.    According to records, at 2:03:04 P.M., Phoenix Fire Department is dispatched to the jail.

289.    At 2:08:47 P.M., Phoenix Fire arrives on scene.

290.    At 2:10:30 P.M., Phoenix Fire arrives at Remon's body.

291.    According to records, at 2:20:52 P.M., an entry from Phoenix Fire states "Rescue Leave".

292.    At 2:26:37 P.M., Phoenix Fire arrives at the hospital.

293.    At 2:36:34 P.M., Phoenix Fire transfers care to the hospital.

294.    The Fire report discusses a dark liquid pouring out of his mouth when they arrived. This was a condition commonly known as "coffee ground emesis" wherein the body's blood starts seeping into the stomach and coagulating, causing vomiting of fluid that is slightly lumpy and has the appearance of coffee grounds. It is a sign of internal bleeding.

295.    They had years' worth of medical records for Remon in their system – and as discussed herein, they had a continuous medical history for Remon that showed multiple previous incidents of Remon suffering from DKA.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

296.    They even marked him – as discussed above – at 7:05:11AM as having type one (1) diabetes and opiate withdrawals at his intake on October 13, 2023.

297.    As discussed herein, they gave Remon no medications for his diabetes. They let it run unchecked and effectively signed his death warrant on October 13, 2023.

298.    The Phoenix Fire Department reported that "E2 arrived at jail. Jail staff exited facility performing cpr while bringing pt out to fire. Resuscitation efforts were taken over by engine 2. Pt was had (sic) a dark liquid pouring out of his mouth as jail staff carted him out. Fluid continued to come out of patients mouth through transport. Suctioning applied to clear airway multiple times. ***Staff had no information on hand about the pt or his history***. Pt transported to BUMC as a full code via rescue 3." (emphasis added).

299.    Phoenix Fire reported that Remon's condition remained unchanged on the way to the hospital.

300.    At the hospital, Remon's glucose levels were immediately checked and his blood sugar level was 512.

301.    Banner hospital records stated that "Available history was limited".

302.    Dr. Zachary James Hernandez, MD of Banner stated in his Medical History notes:

> Yohannes Remon is a male of unknown age (likely between 30-50 years) with ***pmh of T2DM*** and polysubstance abuse who was brought in by EMS from jail after he was found unresponsive and asystolic. ***Per the officer, pt was brought into jail yesterday morning. Today he went to the jail nurse 2x complaining of fatigue and was told to rest***. Jail nurse found him unresponsive later. Time down is unknown. While jail personnel were performing CPR patient had coffee ground emesis. (emphasis added).

303.    This indicates that the most the MCSO staff told the hospital was that he was a type two (2) diabetic – which is incorrect and can cause the wrong treatments to be given to a type one (1) diabetic.

304.    The Doctors at Banner performed further tests on Remon. These included a check of his Procalcitonin ("PCT") levels.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

305. His PCT levels at that time show his respiratory level at 3.56 ng/mL and his sepsis level was at 4.34 ng/mL as of 5:10 P.M. October 14, 2023.

306. He was septic.

307. His sepsis PCT level was 3.84 ng/mL over the limit of what is considered septic.

308. Coupled with his now 512 blood glucose level means he was in the late stages of DKA.

309. He could not be kept breathing properly without the use of a ventilator.

310. Remon was also diagnosed with an anoxic brain injury; multiple organ failure; and was put on immediate continuous dialysis.

311. Remon died at 11:11 P.M. on October 15, 2023 after no treatments could bring him back from his coma.

312. Dr. Zachary James Hernandez, MD of Banner stated in his final report:

Yohannes Remon is a male of ***unknown age (likely between 30-50 years)*** with pmh of T2DM and polysubstance abuse who was brought in by EMS from jail after he was found unresponsive and asystolic. Per the officer, pt was brought into jail yesterday morning***. Today he went to the jail nurse 2x complaining of fatigue and was told to rest***. Jail nurse found him unresponsive later. Time down is unknown. ***While jail personnel were performing CPR patient had coffee ground emesis***. EMS attempted intubation but were unsuccessful. EMS had him on the lucas for chest compressions. In the ED pt was intubated and coded for about 30 minutes. During his resuscitation he went into V-fib and was defibrillated once at 200 J biphasic. He went into sinus tachycardia immediately. ***Labs were significant for POC glucose of 500 and lactic acid >20***. In total he was given 5 amps of epi, 1 amp of sodium bicarb, 1 g of calcium IV, 10U IV insulin, and about 6L of fluid. Bedside point-of-care ultrasound demonstrates hyperdynamic cardiac contractility with no pericardial effusion, no significant pleural effusions, no pneumothorax, no intra-abdominal free fluid, a flat IVC, and no urine in his bladder. An indwelling Foley catheter was placed and there was no urine output. An OG tube was placed and he had dark emesis. CT head showed anoxic brain injury. ***Labs indicative of DKA.*** (emphasis added).

313. Remon's demographic information was not even provided to the Banner hospital. The hospital staff had to guess his age range.

28

314.    Additionally, according to Banner doctor Trevor Hodson, MD's notes, the MCSO officers told him that Remon had been treated with insulin at the jail: "Per the officer, pt was brought into jail yesterday morning, went to the jail nurse 2x complaining of fatigue and was told to rest. ***Per officer he was also started on his insulin medication while at Jail***. Jail staff found him unresponsive later. Time down is unknown." (emphasis added).

315.    As discussed herein, that was absolutely false. Remon was not given fast acting insulin or Lantus at any time during his incarceration. If he had been, his blood sugar levels would not have continued to soar out of control.

316.    The information the officers provided to Dr. Hodson was likely an attempt to cover up the fact that the Defendants failed completely to provide proper medical care to Remon.

## AFTER THE FACT ADDITIONS/ADDENDUMS TO REMON'S FILE

317.    Remon had an undisputed medical emergency at 09:27 A.M.

318.    Remon had an undisputed medical emergency at 01:54 P.M.

319.    He was taken offsite by Fire at 2:20 P.M.

320.    Notes were not added to his medical records until 3:49 P.M.

321.    On October 14, 2023, at 3:49:23 PM, "RN; 2846H" – who is Audaine Rintala – posted the following in her SOAPE note regarding Remon: "late entry; Mandown was called approx 0927 … on arrival pt is laying on floor talking with officers 'I need Gatorade, I feel weak' pt talking to this RN 'I would like some Gatorade, I didn't want to get up this morning. ***I am a diabetic I haven't had my blood sugar checked***' pt is alert and orients x 4, skin is dry. Pt sat up and ***drank 4 cups of Gatorade***." (emphasis added).

322.    Remon's blood sugar at 09:27 was 340.

323.    In response, CHS Defendants gave Remon 4 cups of Gatorade.

324.    No insulin or other drugs to combat his already extremely high blood sugar were administered.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

325.    As discussed, Gatorade has fourteen (14) grams of sugar per cup.

326.    CHS' and its employees' response to Remon's blood glucose level of 340 was to have Remon drink 56 grams of sugar.

327.    A type one (1) Diabetic CANNOT be given more sugar at those levels.

328.    They MUST be given insulin and proper hydration to stop the oncoming DKA.

329.    After giving him the Gatorade, a blood sugar order form was entered into the system.

330.    They knew at that point that he needed diabetic care, but did nothing about it.

331.    The only pseudo-timely entry in Remon's record was following his medical emergency at 9:27 A.M., wherein Pamela Conn "ordered" and Rintala entered an order at 9:45 A.M. for blood sugar check.

332.    We know his blood sugar was checked. Again, it was 340.

333.    Pamela Conn had treated Remon many times prior to this. She knew he was a type one (1) diabetic.

334.    The missteps did not stop there.

335.    There were "late entry" additions.

336.    One of the "late entry" records shows that Rintala stated that s/he had contacted Pamela Conn NP and that they would need to place Remon on "RISS x 90 days, accucheck BID continuous".

337.    RISS means Regular Insulin Sliding Scale.

338.    This is something Remon had been on throughout his CHS medical history.

339.    These notes should have been in the system immediately upon his arrival at the MCSO facilities.

340.    Regardless, the absolute lack of concern and care given to Remon is obvious. During the 09:27 "man down" incident, staff should have reviewed his medical history and realized that what he needed was insulin. His record is literally rife with these needs.

MILLS + WOODS LAW, PLLC
5055 North 12h Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

30

341.    Rintala posted an addendum at 8:03:32 P.M. stating: "addendum to previous note: per p. conn NP A1c and CMP to be completed 10/16/2023. orders were entered at time of assessment."

342.    Wright created a late entry record on October 16, 2023 at 5:27:52 AM stating:

Late entry: 1356 mandown called 1357: on arrival pt unresponsive with dark brown fluid with coffee ground like emesis near pt. No pulse found this RN initiated chest compressions, request for Phx fire made. Pt had large amounts of coca cola colored fluid with small brown particles with each compression. AED was applied before pt placed on backboard. O2 applied with AMBU back @ 15 L pt remains unresponsive with no pulse. Chest compressions continued with suction. large amounts of fluids continues to come out. approx. 1408: Phx fire took over chest compressions. Per Phx fire pt has heart rhythm provider P. Conn NP was present during man down. CH132 all orders TO RAV unable to complete vitals signs bodily fluids all over area and pt

343.    On October 16, 2023 at 9:39:40 A.M., Wright posted to Remon's record that he was admitted to the hospital as a "JOHN DOE" and that the contributing factors to Remon's death was Diabetic ketoacidosis and anoxic brain injury.

### INDIVIDUAL LIABILITY

344.    Pamela Conn, NP, Michael Chailland, LaShon Arrington, Andrew Fairfield, Audaine Rintala, Victor Gan, MD, Robin Avalos, Michelle Martin, NP; Mary Daugomah, Julie Stevens, Sira Hodge, Cynthia Wright, and Christi Trevett were all charged with the medical care of Remon Yohannes.

345.    Each and every one of them had the opportunity to provide medical care to Remon.

346.    As discussed herein, they all either saw him personally or entered medical notes in his records.

347.    Records claim to show that continuity of care was checked.

348.    Each of them, individually, and under the color of law failed to provide Remon the care he desperately needed.

349.     Their actions and inactions were unreasonable and recklessly indifferent in regards to providing this care to Remon.

350.     An objective observer would have looked at Remon's records, his symptoms, and his vitals and knew that he needed diabetic care.

351.     An objective observer would be appalled at the actions and inactions taken by each and every one of these individuals.

352.     These actions and inactions led directly to the death of Remon Yohannes.

353.     Sergeant Miranda Sanders and Bryant Ball were MCSO guards on duty at the time Remon had his multiple health emergencies, yet failed to perform proper checks between his "man down" emergencies to ensure Remon's safety and care.

354.     According to Miranda's LinkedIn profile, her job duties include "***The Detention Officer Sergeant is responsible for work of considerable difficulty supervising a unit or shift of Detention Officers to ensure the control, custody and care of inmates***."

355.     Had they – or other guards whose names are still unknown – actually checked on Remon, he would still be alive today.

356.     They were derelict in their duties and recklessly indifferent to Remon's rights.

357.     An objective observer would have seen that Remon was unable to communicate and was in severe distress.

358.     Their failure to properly check on Remon prevented Remon from receiving timely medical care. They contributed directly to his death.

359.     Ball did visit Remon's cell, but never reported to anyone that Remon was in distress – despite the obvious signs.

360.     Parole Officer Mark Guerra, COII Yesenia Sambrano #10215, and Sergeant Allison Slaton were charged with the care, custody, and control of their parolee, Remon Yohannes.

361.     Their gross dereliction of their duties was recklessly indifferent to Remon's rights.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

362.    Their actions and inactions led Remon to be put on the streets without medications.

363.    This led to Remon's deteriorating health and contributed to the host of bumbling actions that caused Remon's death.

364.    As discussed herein, Michael Villegas' actions and inactions in failing to address Remon's clear symptoms contributed to Remon's deteriorating health and the eventual death of Remon Yohannes.

365.    Axiom Care's employees' actions and inactions – at least those currently known, including Deanna Moore, Lead Counselor 1, Sarah Zavala, NP, and Kellee Zambrano, Detox Tech – contributed to the failure to ensure Remon had the proper medical care he needed.

366.    Their callousness in allowing Remon to leave while noting that there were no medications of note contributed to his deteriorating health and the host of bumbling actions that caused Remon's death.

## SUPERVISOR LIABILITY

367.    As Sheriff at the time of Remon's death, and during the entirety of Remon's control by MCSO in the relevant time periods of this NOC, Paul Penzone was responsible for the oversight of his Jails and employees and is responsible for his employees under *respondeat superior.*

368.    The policies, customs, and practices clearly show that MCSO and its employees were lazy and indifferent to the health and care of its pre-trial detainees, of which Remon was.

369.    Axiom Care is liable for the actions of its employees under the legal theory of *respondeat superior.*

370.    Maricopa County is charged with the oversight and control of the Maricopa County Correctional Healthcare Services and its employees. The County's customs and practices related to the care of its patients in the MCSO jails is clearly deficient. The employees failed to enter and maintain medical records sufficient to provide the proper

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

33

care for the individuals under their care and control. Maricopa County is liable for the actions of its employees under the legal theory of respondeat *superior.*

371.    Upon information and belief, Maricopa and CHS implemented a blanket policy in 2022 to feed Gatorade to any new detainee that exhibited signs of dehydration – regardless of their medical information.

372.    Captain Brent Williams of the 4th avenue jail is responsible for the actions of his supervisees and the promulgation and adherence to that responsibility. He failed to properly supervise his employees in the care, custody, and control of Remon Yohannes.

373.    Captain Jannis Mossman of the ITR jail is responsible for the actions of his/her supervisees and the promulgation and adherence to that responsibility. S/He failed to properly supervise his/her employees in the care, custody, and control of Remon Yohannes.

374.    David Crutchfield is the Medical Director of CHS. He failed to ensure that his employees properly and carefully provided medical care to those in their care, custody, and control, resulting in his employees' complacency and reckless indifference towards Remon's life.

375.    A sweeping overhaul of the way his employees treat those in their care is necessary.

376.    His inaction towards reviewing the medical care provided by his employees led directly to their complacency and reckless indifference.

377.    He is at least partially responsible for the promulgation of CHS policies and procedures. MCSO and CHS implemented a policy to feed Gatorade to all incoming detainees if they show signs of dehydration without a continuity of care check.

378.    Similarly, Lisa Struble is the Director of CHS. She failed to ensure that her employees properly and carefully provided medical care to those in their care, custody, and control, resulting in her employees' complacency and reckless indifference towards Remon's life.

379.    A sweeping overhaul of the way her employees treat those in their care is necessary.

380.    Her inaction towards reviewing the medical care provided by her employees led directly to their complacency and reckless indifference.

381.    She is at least partially responsible for the promulgation of CHS policies and procedures. MCSO and CHS implemented a policy to feed Gatorade to all incoming detainees if they show signs of dehydration without a continuity of care check.

382.    Victor Gan, MD is upon information and belief an assistant medical director of the ITR jail.

383.    He is charged with reviewing medical records for continuity of care and ensuring that his staff does the same. He is responsible for ensuring – not just under the Hippocratic Oath – that patients are treated with dignity and to do no harm to his patients.

384.    He is responsible for training his medical staff on crisis responses and recognition of serious medical conditions.

385.    He failed utterly in his duties to do no harm, leading directly to the failure to provide desperately needed medical care to Remon, a type one (1) diabetic.

386.    His objectively unreasonable and recklessly indifferent actions can be seen for years with notes in Remon's medical history and led directly to Remon's death.

387.    In a previous DKA incident involving Remon, he wrote that Remon was NOT a type (1) diabetic and therefore could not be in DKA.

388.    This is obviously false.

389.    Phoenix Police Chief Michael Sullivan is responsible for the actions of his employees and ensuring that his employees adhere to strict methodologies when performing tasks as simple as observation of a detainee. His employees failed to meet even that simple task. He is responsible for the reckless indifference exhibited by his employees towards Remon's life that led to Remon's death.

390.    The City of Phoenix is liable for the inactions and blatant reckless indifference of its employees as a result of their woefully deficient customs and practices.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

## COUNT I

## WRONGFUL DEATH AND SURVIVAL ACTION PURSUANT TO A.R.S § 12-611, *et seq.* and A.R.S. § 14-3110

*(All Defendants)*

391.    Plaintiffs incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

392.    A.R.S. § 12-611, *et seq.* provides that "When death of a person is caused by wrongful act, neglect or default, and the act, neglect or default is such as would, if death had not ensued, have entitled the party injured to maintain an action to recover damages in respect thereof, then, and in every such case, the person who or the corporation which would have been liable if death had not ensued shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death was caused under such circumstances as amount in law to murder in the first or second degree or manslaughter."

393.    A.R.S. § 14-3110 provides that "Every cause of action, except a cause of action for damages for breach of promise to marry, seduction, libel, slander, separate maintenance, alimony, loss of consortium or invasion of the right of privacy, shall survive the death of the person entitled thereto or liable therefor, and may be asserted by or against the personal representative of such person, provided that upon the death of the person injured, damages for pain and suffering of such injured person shall not be allowed."

394.    Edmon Yohannes is the personal representative of the Estate and has the authority to bring a survival action.

395.    Tesfai Haggmana is the father of Remon and has the right under Arizona law to bring a wrongful death action on behalf of all statutory beneficiaries.

396.    Defendants acts and omissions caused the wrongful death of Remon by failing to document, review, or provide care based on Remon's medical history and conditions.

397.    Furthermore, the failure of the City, Villegas, State Defendants, Maricopa Defendants, and Axiom, to maintain custody and control and allow Remon to disappear

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

multiple times led directly to Remon's deteriorating medical condition and ultimate death.

398.    Additionally, the City, State, Axiom, Maricopa, and Sheriff are vicariously liable for the acts and omissions of their employees, including without limitation those employees listed herein.

399.    As a direct and proximate result of the unlawful, reckless, and grossly negligent actions of the Defendants, Remon suffered an untimely and preventable death and lost the ability to provide support for his entire family.

400.    As a direct and proximate result, Remon's father and mother have been deprived of the continued companionship and society of their son, and have suffered and continue to suffer the loss of a loved one, affection, companionship, care, protection, guidance, as well as pain, grief, sorrow, anguish, stress, shock, mental suffering, and have suffered both economic and non-economic damages in an amount to be proven at trial.

401.    Additionally, the acts of Defendants and their employees and agents, as set forth above, demonstrate gross and wanton negligence in that each of them knew or had reason to know that their acts individually and collectively created an unreasonable risk of bodily harm to Remon and a high probability that substantial harm would result.

402.    In causing the painful, barbaric and premature death of Remon, Defendants and their employees and agents acted with an evil mind and a malignant heart warranting an award of punitive damages.

## COUNT II
## GROSS NEGLIGENCE
*(All Defendants)*

403.    Plaintiffs incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

404.    Under Arizona Revised Statute § 12-820.02(A) a public employee acting within the scope of the public employee's employment can be liable for damages and injuries if the employee was grossly negligent.

405.    The basic elements of actionable negligence are a duty owed to the plaintiff,

a breach thereof and an injury proximately caused by the breach. *Ballesteros v. State*, 161 Ariz. 625, 627, 780 P.2d 458, 460 (App. 1989).

406.    "A duty is a matter of 'the relation between individuals which imposes upon one a legal obligation for the benefit of another.'" *Id*. (internal citations omitted). A duty is breached when the defendant fails to conform to the standard of care reasonable under the circumstances. *Ballesteros*, 161 Ariz. at 627.

407.    At all relevant times, each and every Defendant had a duty to exercise ordinary care for the safety of Remon.

408.    This includes taking certain actions and refraining from other actions such that the safety from harm to Remon was preserved.

409.    Defendants grossly breached that duty systematically and repeatedly, including their acts and omissions set forth above, resulting in severe personal injury, emotional distress, and the wrongful death of Remon.

410.    Defendant COP is vicariously liable under respondeat superior for the actions of any employee, agent, or servant of Phoenix and the Phoenix Police Department, including that of Villegas.

411.    Defendant Maricopa is vicariously liable for the actions of any employee, agent, or servant of Maricopa and CHS, including that of the CHS Defendants.

412.    Defendant Penzone is vicariously liable for the actions of any employee, agent, or servant of MCSO, including that of the MCSO Defendants.

413.    Defendant State of Arizona is vicariously liable for the actions of any employee, agent, or servant of ADOC, including that of the ADOC Defendants.

414.    Defendant Axiom is vicariously liable for the actions of any employee, agent, or servant of Axiom.

415.    As alleged herein each of the Defendants had a responsibility to ensure that Remon was safe and that he received proper medical treatment.

416.    As alleged herein, the State, ADOC Defendants, Axiom, and Axiom's employees and agents, ignored Remon multiple times – allowing him to leave unchecked from secured facilities which in turn allowed him to "hit the streets", relapse, and suffer

Mills + Woods Law, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

major injuries such as second degree burns and fractures, in complete dereliction of their duties to protect Remon. These actions and inactions led Remon down a path that ultimately killed him.

417.    As alleged herein, the CHS Defendants, Maricopa, Penzone, and MCSO Defendants failed Remon in the simplest of tasks – ensuring his safety and ensuring his medical conditions were being properly treated. As alleged herein, Remon was virtually ignored by MCSO staff and his medical concerns were completely ignored by CHS staff, all of which contributed to and caused Remon's wrongful death.

418.    These Defendants, while acting as agents and employees for MCSO, Penzone, Maricopa, and CHS owed a duty to Remon to perform their responsibilities to provide custody, care, and control of Remon.

419.    These Defendants, while acting as agents and employees for MCSO, Penzone, Maricopa, and CHS, owed duties to Remon to act objectively reasonably under the circumstances.

420.    These Defendants' failure to provide security and medical attention to Remon constitutes recklessness and/or gross negligence for which the Defendants are individually liable.

421.    The CHS Defendants' conduct, in providing medical care that grossly fell below the standard of care – failing to check medical record continuity, failing to provide life-saving medication despite having full knowledge of Remon's medical conditions, lying about health checks when the video evidence demonstrably shows that no medical health checks were performed, and actively feeding Remon Gatorade – constitutes negligence and gross negligence for which the Individual Defendants are individually liable.

422.    In taking the actions as described above, these Defendants breached their duty to refrain from such unreasonable and indifferent conduct.

423.    As a direct and proximate result of these Defendants' breaches, Remon sustained severe and permanent injuries, suffered extreme pain and suffering, and died.

424.    These Defendants' acts and omissions set forth above, also demonstrate gross

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

and wanton negligence in that each of them knew or had reason to know that their acts individually and collectively created an unreasonable risk of bodily harm to Remon and a high probability that substantial harm would result.

## COUNT III
## NEGLIGENCE
### *(Axiom)*

425.    Plaintiffs incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

426.    The basic elements of actionable negligence are a duty owed to the plaintiff, a breach thereof and an injury proximately caused by the breach. *Ballesteros v. State*, 161 Ariz. 625, 627, 780 P.2d 458, 460 (App. 1989).

427.    "A duty is a matter of 'the relation between individuals which imposes upon one a legal obligation for the benefit of another.'" *Id*. (internal citations omitted). A duty is breached when the defendant fails to conform to the standard of care reasonable under the circumstances. *Ballesteros*, 161 Ariz. at 627.

428.    At all relevant times, Axiom and its employees and agents had a duty to exercise ordinary care for the safety of Remon.

429.    This includes taking certain actions and refraining from other actions such that the safety from harm to Remon was preserved.

430.    Axiom and its employees and agents grossly breached that duty systematically and repeatedly, including their acts and omissions set forth above, resulting in severe personal injury, emotional distress, and contributed to and caused the wrongful death of Remon.

431.    Defendant Axiom is vicariously liable for the actions of any employee, agent, or servant of Axiom, including its employees and agents.

432.    In taking the actions as described above, these Defendants breached their duty to refrain from such unreasonable and indifferent conduct.

433.    As a direct and proximate result of these Defendants' breaches, Remon sustained severe and permanent injuries, suffered extreme pain and suffering, and died.

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

434.     These Defendants' acts and omissions set forth above, also demonstrate gross and wanton negligence in that each of them knew or had reason to know that their acts individually and collectively created an unreasonable risk of bodily harm to Remon and a high probability that substantial harm would result.

**COUNT IV**

**CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS AND 42 U.S.C. § 1983**
**(CHS Defendants, MCSO Defendants)**

435.     Plaintiffs incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

436.     42 U.S.C. § 1983 provides individuals with a cause of action to sue for violations of his or her constitutional rights. The 14th Amendment protects individuals from constitutional violations of State and local authorities. As incorporated by the 14th Amendment, the 8th Amendment protects individuals from the use of cruel and unusual punishment by detention staff. The Defendants, while acting in their official capacity and individual capacities and under the color of law, violated Remon's rights to freedom from cruel and unusual punishment.

437.     As alleged herein, the CHS Defendants and MCSO Defendants all knew that Remon was suffering from a serious medical need that posed an excessive risk to his health.

438.     Continuity medical records showed CHS Defendants and MCSO Defendants that Remon was a type one (1) diabetic. Records further show that at Remon's intake on October 13, 2023, his blood sugar levels were taken.

439.     CHS Defendants and MCSO Defendants failed to provide Remon his needed medication and failed to properly monitor Remon even though he was exhibiting signs of a medical crisis.

440.     A reasonable officer or medical professional in the same shoes as these defendants would have known that Remon was suffering from a serious medical need that posed an excessive risk to his health.

441.     It is common knowledge that type one (1) diabetics require regular insulin.

Any reasonable officer or medical professional in the same shoes as these defendants would know that failing to provide medical care to Remon would create in unjustifiably high risk of harm to Remon.

442.    CHS Defendants and MCSO Defendants not only ignored the risk of harm to Remon, but through their actions, accelerated Remon's medical emergency to the point that caused his death.

443.    Additionally, the acts of these Defendants and their employees and agents, as set forth above, demonstrate gross and wanton negligence in that each of them knew or had reason to know that their acts individually and collectively created an unreasonable risk of bodily harm to Remon and a high probability that substantial harm would result.

444.    In causing the painful, barbaric and premature death of Remon, Defendants and their employees and agents acted with an evil mind and a malignant heart warranting an award of punitive damages.

## COUNT V

## CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS AND 42 U.S.C. § 1983 – *Monell* – POLICY, CUSTOM AND PRACTICE

### *(Maricopa, Penzone)*

445.    Plaintiff incorporates by reference all previous allegations as fully set forth herein.

446.    As previously explained, U.S.C. § 1983 provides individuals with a cause of action to sue for violations of their constitutional rights.

447.    Defendant Maricopa and Defendant Penzone's acts or failure to act deprived Remon of his constitutional rights.

448.    As described herein, Maricopa and Penzone implemented and adopted a blanket policy in 2022 to provide Gatorade to all new detainees that exhibited signs of dehydration regardless of their medical history.

449.    MCSO and CHS employees did in fact follow the policy.

450.    The existence of this policy enabled CHS Defendants and MCSO Defendants

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

42

to provide improper medical care.

451.    Remon was cruelly and unusually punished because of this policy, resulting in his death.

452.    It is unquestionable that there is a systemic failure by Maricopa and Penzone by implementing policies that deliberately go against the standards of care medically, but also deprive individuals of their Constitutional Rights.  These failures have allowed, supported, and established the commonplace use of medical treatment that causes harm to individuals such as Remon.

453.    Therefore, the established customs and practices led directly to the death of Remon.

454.    Maricopa and Penzone are liable for Remon's death due to its established policy, customs, patterns, and practices.

## COUNT VI

## BATTERY AND SURVIVAL ACTION  PURSUANT TO A.R.S § 12-542, 14-3110

*(CHS Defendants)*

455.    Plaintiffs incorporate the allegations in the foregoing paragraphs as though fully set forth herein.

456.    The CHS Defendants intentionally fed Remon Gatorade causing harmful or offensive contact with Remon.

457.    As a direct and proximate result of the CHS Defendants' harmful or offensive contact, Remon died.

458.    These Defendants' acts constitute a battery upon Remon in the above-described bodily contact was intentional, unauthorized, or grossly offensive in nature.

459.    The acts and omissions of these Defendants were intentional, negligent, reckless, and unwarranted, and without any just cause or provocation.

460.    The CHS Defendants had a pattern of previous encounters with Remon wherein they disputed his type one (1) diabetes diagnosis.

461.    The CHS Defendants had a pattern of failure to treat Remon for his type one (1) diabetes, resulting in Remon entering DKA on multiple occasions – further requiring

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556

his transport to the hospital.

462.    As a direct and proximate result of these Defendants' conduct, Remon was deprived of his liberty, and was ultimately killed. The conduct described herein was undertaken by the CHS Defendants within the scope of their employment and under color of law such that their employer, Maricopa County is vicariously liable for their actions because of its knowledge that the CHS Defendants had a propensity to fail to treat Remon according to medical standards of care.

## JURY TRIAL DEMAND

463.    Plaintiffs hereby demand a jury trial in this matter as to all claims and against all Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs requests that the Court enter judgment against the Defendants and in favor of the Plaintiffs, as follows:

a)  For compensatory, general and special damages against each and every Defendant, jointly and severally, in an amount to be proven at trial;

b)  For all other non-pecuniary damages as to be proven at trial;

c)  For punitive and exemplary damages against Defendants in an amount appropriate to punish the wrongful conduct alleged herein and to deter such conduct in the future;

d)  For pre-and post judgment interest to the extent provided by law;

e)  For Plaintiffs' incurred costs, including all incurred attorneys' fees and court costs, pursuant to 42 U.S.C. §1988 and as otherwise authorized by any other statute or law; and

f)  For such other relief as this Court may deem proper.

///

///

44

**RESPECTFULLY SUBMITTED** this 8th day of November 2024.

**MILLS + WOODS LAW, PLLC**

By_____*/s/ Sean A. Woods*_____
    Robert T. Mills**Error! Reference source not found.**
    **Error! Reference source not found.**
    5055 North 12th Street, Suite 101
    Phoenix, Arizona 85014
    *Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 8, 2024, I electronically transmitted the foregoing document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Sean P. Healy
sean.healy@lewisbrisbois.com
donna.hatheway@lewisbrisbois.com
holly.bornhoft@lewisbrisbois.com
Jay R. Rademacher
jay.rademacher@lewisbrisbois.com
mariana.lara@lewisbrisbois.com
**LEWIS BRISBOIS BISGAARD & SMITH LLP**
Phoenix Plaza Tower II
2929 N Central Ave., Ste. 1700
Phoenix, AZ 85012-2761
*Attorneys for Defendant State of Arizona*

Christopher J. Berry
cberry@berrylawgroup.com
**BERRY LAW GROUP, PLLC**
admin@berrylawgroup.com
1850 N Central Ave., Ste. 1025
Phoenix, AZ 85004
*Attorneys for Defendant Maricopa County*

Kim Chamberlain
kim.chamberlain@mcao.maricopa.gov
andrea.moreno@mcao.maricopa.gov
judith.ezeh@mcao.maricopa.gov
Charles Trullinger
trullinc@mcao.maricopa.gov
loucksd@mcao.maricopa.gov
shinabad@mcao.maricopa.gov
**MARICOPA COUNTY ATTORNEY**
Civil Services Division
ca-civilmailbox@mcao.maricopa.gov
225 W Madison St.
Phoenix, AZ 85003
*Attorneys for Defendant Paul Penzone*

Jody C. Corbett
jody.corbett@phoenix.gov
maria.sandoval@phoenix.gov
**OFFICE OF THE CITY ATTORNEY**
law.civil.minute.entries@phoenix.gov
200 W Washington, Ste. 1300
Phoenix, AZ 85003-1611
*Attorneys for Defendant City of Phoenix*

James Jellison
jim@jellisonlaw.com
**JELLISON LAW OFFICES, PLLC**
admin@jellisonlaw.com
18801 N Thompson Peak Parkway, Ste. D235
Scottsdale, AZ 85255
*Attorney for Defendant Robin Avalos*

Robert Grasso, Jr.
rgrasso@grassolawfirm.com
jgarcia@grassolawfirm.com
Pari K. Scroggin
pscroggin@grassolawfirm.com
dross@grassolawfirm.com
**GRASSO LAW FIRM, P.C.**
minuteentries@grassolawfirm.com
3075 W Ray Rd., Ste. 110
Chandler, AZ 85226
*Attorneys for Defendant Building Blocks Counseling, LLC d/b/a Axiom Care, Sara*
*Zavala, Deanna Moore and Kellee Zambrano*


        */s/ Ben Dangerfield*

MILLS + WOODS LAW, PLLC
5055 North 12th Street, Ste 101
Phoenix, AZ 85014
Telephone: 480.999.4556